IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA FOR THE
USE OF LAFARGE SOUTHWEST, INC.,
d/b/a LAFARGE NORTH AMERICA,
a New Mexico corporation,

        Plaintiff,

vs.                                            No. CIV 11-0458 RB/RHS

SAFE AND SECURE CONSTRUCTION, LLC,
an Arizona Limited Liability Company, and
THE HANOVER INSURANCE COMPANY,

        Defendants.

SAFE AND SECURE CONSTRUCTION, LLC,
an Arizona Limited Liability Company,

        Counterclaimant,

vs.

LAFARGE SOUTHWEST, INC.,
d/b/a LAFARGE NORTH AMERICA,
a New Mexico corporation,

        Counterdefendant.

## MEMORANDUM OPINION AND ORDER

        This matter is before the Court on Plaintiff Lafarge Southwest, Inc. d/b/a Lafarge North America's ("Lafarge's") Motion for Partial Summary Judgment, (Doc. 63). Hanover Insurance Company ("Hanover") filed a response. Safe and Secure Construction, LLC ("SSC") did not

respond to the motion.[1]  Briefing is complete and the motion is ready for decision.  Jurisdiction is based on 28 U.S.C. §§ 1331 and 1367.  Having considered the submissions of counsel and the relevant law, the Court grants this motion.

## I.     Background

On May 24, 2010, the United States Department of Transportation, through the Federal Highway Administration ("FHWA" or "Government"), awarded to SSC Contract Number DTFH68-10-C-00019 ("Contract") for road construction, paving, grading, asphalt surfacing, and drainage to improve Tent Rocks Road at Kasha-Katuwe-Tent Rocks National Monument and Juniper Campground at Bandelier National Monument ("Project").  Hanover issued payment bonds to SSC for the project pursuant to the Miller Act, 40 U.S.C. '3131, *et seq*.  SSC executed a purchase agreement ("Purchase Agreement") with Lafarge to supply hot mix asphalt ("asphalt") and aggregate base course ("base course") for the Project.

Lafarge brings the instant suit to recover money allegedly due under the Purchase Agreement.  SSC denies that it owes any money to Lafarge and asserts a counterclaim for breach of the Purchase Agreement based on Lafarge's alleged failure to provide asphalt conforming to the Government's specifications and delay in delivery of the materials.  Hanover denies liability, adopts SSC's affirmative defenses, and asserts that Hanover's liability, if any, is capped at the amount of the bond.

Lafarge moves for partial summary judgment on the counterclaim, arguing that Lafarge complied with the terms of the Purchase Agreement and SSC cannot recover liquidated damages

---

1 On August 27, 2012, Marcus Garcia entered his appearance on behalf of SSC.  Therefore, concerns about SSC's pro se status are moot.

that were not assessed by the FHWA. Hanover responds that the Purchase Agreement required Lafarge to supply asphalt in accordance with SSC's contract with the Government and SSC's settlement with the Government did not relieve Lafarge of liability for liquidated damages. In its reply brief, Lafarge maintains that it supplied the asphalt in accordance with the Purchase Agreement and SSC cannot recover liquidated damages that were not assessed.

## II.   Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In cases where the moving party will not bear the burden of persuasion at trial, it bears the initial responsibility of identifying an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Upon meeting this burden, the burden shifts to the non-movant to show specific facts supporting a genuine issue for trial as to all of the essential elements of his case. *Muñoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) ("The party opposing the motion must present sufficient evidence in specific, factual form . . . ."). When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party. *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1142 (10th Cir. 2009).

## III.   Statement of Facts

The Court must view the facts in the light most favorable to SSC and Hanover. *See Turner*, 563 F.3d at 1142. Thus, all reasonable inferences are drawn, and factual ambiguities are resolved, in favor of SSC and Hanover.

On May 24, 2010, the FHWA awarded the Contract for the Project to SSC. (Doc. 64-1,

Pl. Ex. 1). The Contract incorporated the FHWA's Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects, (Doc. 64-5), as well as specific requirements for asphalt, namely "Superpave Hot Asphalt Concrete Pavement Design Requirements, AASHTO R 35." (Doc. 64-1 at 6-10).

On April 30, 2010, Lafarge sent the following quotation for asphalt to SSC:

| QTY TONS | MIX CODE | DESCRIPTION | F.O.B | UNIT PRICE |
| --- | --- | --- | --- | --- |
| 11900 | AS4148 | SP-IV PG 64-22 NMDOT (complete) | Santa Ana | $54.50 |
| | | Lime | N/A | $145.00 |
| | | PG 64-22 | N/A | $475.00 |
| HAUL AVAILABLE AT THE FOLLOWING RATES: (Based on full semi or tandem loads) | | | Semi $6.50 | Tandem $9.60 |

(Doc. 12-1). The asphalt quotation states, in pertinent part, that: "All prices are subject to the terms and conditions stated on the following page of this proposal." (Doc. 12-1 at 11). On June 17, 2010, Lafarge sent SSC a quotation for base course. (Doc. 12-1 at 12).

On June 21, 2010, SSC sent Lafarge a cover page and a Standard Form Purchase Order (Purchase Order) for the asphalt and base course. (Doc. 12-1 at 1-10). Notably, Article 3 of the Purchase Order contains the following table:

3. PRICE.

| QTY TONS | MIX CODE | DESCRIPTION | UNIT PRICE |
| --- | --- | --- | --- |
| 11900 | AS4148 | SP-IV PG 64-22 NMDOT (complete) (delivered) | $61.00 |

(Doc. 12-1 at 3). It is material that the Purchase Order describes the asphalt in the same manner as the quotation, specifically "SP-IV PG 64-22 NMDOT." (Doc. 12-1 at 3).

The Purchase Order references the Contract. For instance, Article 5 of the Purchase Order provides:

5. EXTENT OF AGREEMENT . . . Except as otherwise provided in the contract

4

> between the Owner and the Buyer for the Project ("Contract"), a copy of which is attached, this Purchase order is solely for the benefit of the Parties, represents the entire and integrated agreement between the Parties, and supersedes all prior negotiations, representations, or agreements, either written or oral.

(Doc. 12-1 at 4). Notably, the Contract is not attached to the Form Purchase Order and the asphalt specifications of the Contract are not set out in the Purchase Order. (Doc. 12-1). For instance, Article 7 of the Purchase Order references the Contract:

> 7. DRAWINGS AND SPECIFICATIONS All drawings, specifications and other data submitted to Seller and referred to on the face of this Purchase Order are incorporated herein and made a part of this Purchase Order. In addition, the general provisions of the Contract, including requirements for submittals and payment applicable to materials of equipment to be provided under this Purchase Order, and any safety requirements of the Buyer are attached and incorporated by reference. All materials and equipment furnished shall conform to the drawing, specifications, and other information incorporated herein.

(Doc. 12-1 at 4). Conversely, Article 8 of the Purchase Order dictates that submittals must conform to the Purchase Order, and not the Contract:

> 8. SUBMITTALS The Seller promptly shall submit for approval to the Buyer all shop drawings, samples, product data, manufacturers' literature and similar submittals required by the Purchase Order. The Seller shall be responsible to the Buyer for the accuracy and conformity of its submittals to the Purchase Order. The Seller shall prepare and deliver its submittals to the Buyer in a manner consistent with the Progress Schedule and in such time and sequence so as not to delay the Buyer or Owner in performance of the Contract . . .

(Doc. 12-1 at 4).

Article 24 of the Purchase Order states that the Purchase Agreement is governed by the law of the place of the project, which is New Mexico. (Doc. 12-1 at 8).

Lafarge employee Ken Kugler testified in his deposition that SSC sent the cover page and Purchase Order to Lafarge. (Deposition of Ken Kugler at 41, Doc. 78-2). Mr. Kugler "cleaned up" the Purchase Order and attached the quotations for asphalt and base course as well as the

5

Lafarge terms and conditions.  (Kugler Dep. at 38).   This modification is reflected in Article 2 of the Purchase Order, which states it is for "SERVICES Material Supply" and immediately following recites:

> See Exhibit A – Attached hereto and incorporated herein is the Lafarge Quotation including the General Terms & Conditions. Should any term of this Standard Form Purchase order conflict with or create any obligations in addition to those stated in the Exhibit A, then the Exhibit A shall govern the rights and responsibilities of the parties.

(Doc. 12-1 at 3).

Mr. Kugler initialed the preceding paragraph on behalf of Lafarge and an individual with the initials "A.M" initialed the paragraph on behalf of SSC.[2]  (Doc. 12-1 at 3; Kugler Dep. at 37-38, Doc. 78-2; Doc. 12-1).   Mr. Kugler initialed pages 2-8 of the Purchase Order and wrote "subject to Exhibit A" on pages 4-8, including the page containing Articles 5, 7, and 8.  (Kugler Dep. at 39-40, Doc. 78-2; Doc. 12-1).

On June 21, 2010, Mr. Kugler and Chad McDonald, President and CEO of SSC, signed the Purchase Agreement, which includes the cover page, the modified Purchase Order, Exhibit A, and Exhibit B (insurance requirements).   (Doc. 12-1 at 9-10).   Notably, Mr. McDonald signed on a page that specifically references Exhibit A.   (Doc. 12-1 at 9).

The record contains the expert report of Paul Versage, Senior Consultant at Sage Associates, Inc.   (Doc. 64-2 at 1).   Hanover hired Paul Versage as an expert witness and Lafarge attached Mr. Versage's report to its brief.   (Doc. 64-2).   In his expert report, Mr. Versage described the circumstances of Lafarge's submittals of the asphalt design mix

---

[2] Mr. Kugler referred to an SSC representative named Andrea in his deposition.  (Kugler Dep. at 37).

specifications and the resulting events, including delay and a settlement between the Government and SSC that is relevant to the liquidated damages question.

According to Mr. Versage, Lafarge submitted the design mix specifications for the asphalt on June 29, 2010, using the wrong form. (Doc. 64-2 at 4). Lafarge employee Nate Pollock testified in his deposition that all of Lafarge's submittals are on New Mexico Department of Transportation or City of Albuquerque forms. (Deposition of Nate Pollock at 37-38, Doc. 64-7). SSC did not ask Lafarge to submit the design mix specifications on a federal form. (Pollock Dep. at 38). The FHWA rejected the submittal for being on the wrong form and noncompliant with the Project's specifications. (Deposition of Paul Versage at 69-70, Doc. 64-6). Lafarge resubmitted the asphalt specifications on the correct form on or about July 14, 2012. (Doc. 64-2 at 4 & 6; Pollock Dep. at 37-38, Doc. 64-6; Deposition of John Galvin at 114-115, Doc. 64-8). After a series of discussions, the Government reduced the criteria for the asphalt and approved the second submittal of the asphalt design mix specifications on July 16, 2010, or August 5, 2010. (Doc. 64-2 at 4 & 6)

Additionally, Mr. Versage explained that the Contract required test strips of the asphalt to be approved by the FHWA prior to paving the entire roadway. (Doc. 64-2 at 7). According to Mr. Versage, the Government rejected the test strips based on the asphalt design mix. (Doc. 64-2 at 7). The Government decided to impose a reduction of the Contract price and accept the asphalt, which resulted in an additional seven-day delay, from August 10, 2010 to August 17, 2010, for a total delay of 22 days. (Doc. 64-2 at 6). Mr. Pollock, the Lafarge employee, was unaware of the test strip failures until this lawsuit was filed. (Pollock Dep.at 38).

According to Mr. Versage, the delay resulted in the FHWA assessing liquidated damages against SSC in the amount of $2,200 per day for 22 days, which totaled $48,000. (Doc. 64-2 at

7

6).  Additionally, the delay caused SSC's initial paving contractor, JAR Construction, to abandon the Project due to scheduling conflicts.  (Doc. 64-2 at 4).  JAR had been onsite for over two weeks and was only able to pave for three days.  (Doc. 64-2 at 4).  SSC had to compensate JAR for the stand-by time and quickly replace JAR with another subcontractor, FNF Construction, under a higher hourly arrangement.  (Doc. 64-2 at 4).

On May 24, 2011, SSC and the FHWA executed a Settlement Agreement whereby the Government added 143 calendar days to the Contract, resulting in a revised completion date for the Project.  (Doc. 64-3).  The FHWA reversed its assessment of liquidated damages on SSC.  (Doc. 64-4).

### III.  Discussion

#### A. The parties agreed to the terms of the Purchase Agreement

Lafarge contends that it modified the Purchase Order to state that any terms of the Purchase Order that conflicted with, or created any obligation beyond those stated in Exhibit A, did not apply.  SSC responds that Lafarge's attempt to unilaterally reject the terms and conditions of the Purchase Order fails under Uniform Commercial Code (UCC) Section 2-207, N.M. STAT. ANN. § 55-2-207.  Lafarge replies that SSC accepted its asphalt quotation subject to the Lafarge terms and conditions, that Lafarge modified the Purchase Order to state that any terms of the Purchase Order that conflicted with, or created any obligation beyond those stated in Lafarge's quote, were inapplicable and that the modification was initialed and approved by SSC.

The Purchase Agreement provides, and the parties do not dispute, that New Mexico law applies and that the parties are merchants within the meaning of UCC Section 2-207, N.M. STAT. ANN. § 55-2-207 ("Section 2-207").

8

Section 2-207 provides that additional terms inserted unilaterally in a confirmation form become part of a contract between merchants unless: (a) the offer expressly limits acceptance to the terms of the offer, § 2-207(2)(a); the new terms materially alter the contract, § 2-207(2)(b); or (c) objection is made to the new terms within a reasonable time, § 2-207(2)(c). N.M. STAT. ANN. § 55-2-207(2) (a-c). Section 2-207(2) deals with two common situations. *See* N.M. STAT. ANN. § 55-2-207, UCC Cmt 1. The first is where an offer has been made and the acceptance comes by way of a standard form. *Id.* The second is where the parties have already reached an agreement and the standard form is merely a "confirmation" of that agreement. In other words, "[w]here merchants exchange preprinted forms and the essential contract terms agree, a contract is formed under Section 2-207(1)." *Gardner Zemke Co. v. Dunham Bush, Inc.*, 115 N.M. 260, 263, 850 P.2d 319, 322 (1993). "A responding document will fall outside of the provisions of Section 2-207(1) and convey a counteroffer, only when its terms differ radically from the offer, or when acceptance is expressly made conditional on assent to the additional or different terms." *Id.*

In this case, Lafarge added terms to the Purchase Order. The Purchase Order provides that any additional terms proposed by Lafarge are rejected by SSC unless expressly assented to in writing by SSC. (Doc. 12-1 at 3-4). However, SSC expressly agreed in writing to the additional terms inserted by Lafarge by initialing under the paragraph that incorporated Exhibit A and by signing the Purchase Agreement that incorporated the modified Purchase Order and Exhibit A. (Doc. 12-1 at 3-4, 9, & 10). Thus, SSC expressly assented to the terms added by Lafarge. Construed in the light most favorable to SSC, the record establishes that SSC and

9

Lafarge agreed in writing to all the terms in the Purchase Agreement. As SSC and Lafarge agreed to all of the terms contained in the Purchase Agreement, both parties are bound by its terms.

### B. The Purchase Agreement does not incorporate the specifications of the Contract

Lafarge asserts that SSC cannot seek damages for its failure to comply with the terms of its Contract with the FHWA. SSC responds that the Purchase Agreement bound Lafarge to provide all submittals in accordance with the requirements of the Contract. Lafarge replies that it supplied the asphalt that it quoted and contracted to provide.

The Purchase Agreement consistently specifies the asphalt as "SP-IV PG 64-22 NMDOT." (Doc. 12-1 at 3 & 11). The Purchase Agreement does not contain the asphalt criteria specified by the Contract. Nonetheless, Hanover contends that general references to the Contract in the Purchase Agreement bound Lafarge to supply the asphalt as specified by the Contract, rather than the asphalt specified in the Purchase Agreement. Hanover relies on the following language in the Purchase Agreement to support its theory: "All drawings, specifications and other data submitted to Seller and referred to on the face of this Purchase Order are incorporated herein and made a part of this Purchase Order." (Doc. 12-1 at 4). This language is not helpful to Hanover because it refers to the Purchase Order rather than the Contract. Hanover also points to the following statement: "In addition, the general provisions of the Contract, including requirements for submittals and payment applicable to materials of equipment to be provided under this Purchase Order, and any safety requirements of the Buyer are attached and incorporated by reference." (*Id.*). Notably, however, the Contract was not attached to the Purchase Agreement. Additionally, this language refers to the general provisions

10

of the Contract and not the specifications of the Contract.

Hanover reads too much into the Purchase Agreement. While the Purchase Agreement references the Contract, the asphalt specifications of the Contract are not included in the Purchase Agreement. Nowhere does the Purchase Agreement mention the asphalt design mix specified by the Contract. Instead, the Purchase Agreement contains the NMDOT asphalt design mix, SP-IV PG 64-22 NMDOT, in both the body of the Purchase Order and Exhibit A.

Lafarge offered and agreed to supply asphalt described as SP-IV PG 64-22 NMDOT. SSC does not dispute that Lafarge supplied asphalt described as SP-IV PG 64-22 NMDOT. It bears underscoring that there is no evidence in the record that Lafarge was informed of the asphalt specifications contained in the Contract. Simply put, the asphalt specifications in the Contract were not included in the Purchase Agreement between SSC and Lafarge. Rather, Lafarge agreed to supply the asphalt consistent with the NMDOT specifications contained in the Purchase Agreement, and not with the asphalt specifications contained in the Contract. Construed in the light most favorable to SSC, the record establishes that the Purchase Agreement does not incorporate the asphalt specifications contained in the Contract. Thus, Lafarge was not bound to supply asphalt as specified by the Contract.

**C. SSC cannot recover damages that it did not incur**

SSC does not dispute that the assessment of liquidated damages was resolved in its settlement with the FHWA. Nonetheless, SSC maintains that it may recover those liquidated damages from Lafarge and relies on *United States v. Metric Const., Inc.*, 376 F.Supp. 2d 1073 (D.N.M. 2004), for this notion. In *Metric Const.*, the settlement did not release the government's claims for liquidated damages, and the government maintained that it was entitled to liquidated damages. *Metric Const., Inc.*, 376 F.Supp. 2d. at 1076. By contrast, in the instant

11

matter, the settlement covered all claims and the assessment of liquidated damages was reversed. Thus, *Metric Const.* does not support SSC's stance.

In order to recover damages for breach of contract, "[t]here must be proof that damages resulted." *Bank of N.M. v. Rice*, 78 N.M. 170, 177, 429 P.2d 368, 375 (1967) (citing *Louis Lyster, Gen. Con., Inc. v. Town of Las Vegas*, 75 N.M. 427, 405 P.2d 665 (1965) (damage resulting from breach of "contract must be of a kind and character susceptible of proof"). Construed in the light most favorable to SSC, the record establishes that the FHWA reversed its assessment of liquidated damages against SSC after the settlement. In that SSC was not required to pay liquidated damages, SSC cannot recover liquidated damages from Lafarge as a matter of law.

**THEREFORE,**

**IT IS ORDERED** that Lafarge's Motion for Partial Summary Judgment, (Doc. 63), filed on June 4, 2012, is GRANTED.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**

12